We will hear argument next in number 12-1696, Oip Technologies against Amazon.com. As soon as they get settled, Mr. Powers, why don't you come on up. Please. Thank you, Your Honor. May it please the Court. The analytic framework for deciding the issues presented by this appeal I think can be framed by the two Supreme Court decisions in Mayo and Deere. In Mayo, the discovery, the invention, was of a natural phenomenon. In that case, it was the relationship between certain metabolites in the human body and the toxicity or efficacy of a particular drug treatment. That was the invention in Mayo. The means of testing for those metabolites was conventional. And the holding in Mayo was, because what you're trying to claim really is the natural law, the natural phenomenon of the relationship between those metabolites and the drug efficacy, and nothing else was new, you may not have a claim that is not patentable subject matter. Deere, on the other end of the spectrum, is very different. In Deere, the Arrhenius equation was in the claims. What was new was the means of testing to provide information to input into that Arrhenius equation. And in Deere, the claim was held patentable, bless you, because... It's a constant temperature measurement. The better means of providing a temperature input into the Arrhenius equation, exactly. And that was patentable. Despite the fact that the technology was all conventional, the thermocouples were conventional, the computers were conventional, there was nothing new, concededly new, about any of the technology by which you did the measurements. What was new was the testing regime, which produced better information to plug into the Arrhenius equation. In this case, the asserted natural law or phenomenon has been variously described, but is essentially asserted to be the law of demand. Now, there's two problems with that for, in our view. The first is the law of demand is quite different from the Arrhenius equation. It's not actually knowable at any given time, and it changes constantly. The law of demand merely says that all of the things being equal, generally, as prices go up, demand will go down. What we're talking about here is the particular demand curve for a particular product at a particular time. And that changes hourly, maybe, in an e-commerce environment, daily, certainly weekly. No one knows at any given time. What this invention is, is a better way to test for information to plug into that analysis. It does not even claim, in the claims as Deere did, the Arrhenius equation. But it is, like Deere, a means of testing that is new, that provides better information into an old problem. The old problem, no one's saying the problem isn't… The problem I see is that in Deere, what they were improving was an actual manufacturing thing that wasn't abstract. And so they used some new equation and stuff, and putting it together, they come up with a patentable claim. Here, what you're trying to improve is an abstract idea. So how do you get… I mean, I know you want to talk about Deere and Mayo, but isn't this really about Bilski and Alice? There's two parts to that question, and I'm happy to answer both. The first question is whether Deere is limited to the physical transformation of rubber, a physical thing. That's an argument that Amazon makes. Well, I agree with you. I mean, it doesn't have to be limited to. But what it has to be improving is something that itself is not an abstract idea, doesn't it? In my mind, first, that begs the question of the abstract idea. Well, you're not going to dispute that the whole notion of price optimization isn't an abstract idea, are you? I will dispute that this claim covers an abstract idea. I do not dispute that the concept of trying to optimize price is an abstract idea. Not at all. Let me first answer the Deere point, and then get to the Mayo step one point, if I may, because they are very distinct issues, and I really want to address that. On the Deere point, I believe Bilski eliminates the argument that Deere and others should be construed to be limited to the physical transformation of a thing. Bilski was presented squarely with the question of whether there's a categorical exclusion for even business method patents, which you could argue this is not. But even if it is, Bilski eliminates the argument that that's out of bounds, if you will. And claim one of Deere doesn't even claim the physical transformation of anything. It's a method of operating the press. Claim 13 talks about making rubber. So the idea which Amazon argues that Deere is limited to the fact that it's rubber, something physical that you can touch, I think is both eliminated by Bilski and by claim one of Deere. Now to the second point, the Mayo step one point. Everyone agrees, I think there's no dispute, that the law of demand is an abstract concept, trying to optimize that law of demand is an abstract concept. What Alice teaches us is that the test of abstractness, step one, is preemption. Do you preempt that abstract idea? The answer here is clearly no. There are dozens of ways, several of which were presented to the district court. Suppose I did not think that Alice said that the test is preemption, but rather explained that a concern about preemption is what underlies a series of approaches, that the approach first stated in Mayo and then reaffirmed in Alice, was to demand an inventive concept on something other than the abstract idea itself. What is that here? I would agree with half of that, if I may. I think it's fair to say that Alice didn't set up preemption as the definitive test for step one of Mayo. Suppose I thought it didn't actually say it was a test at all. It was an explanation for the test of the inventive concept, and there can be 15 different ways of implementing an abstract idea. You can't have 15 separate patents on them if each one is not inventive, just because each one doesn't preempt. I understand your point, but I think Alice explained, at least in part, the reason for the concern of step one as being holding up the building blocks of invention, if you will. That's in Mayo and other cases as well. I don't believe there's any argument with the concept as amorphous as the law of demand. Amorphous doesn't mean it's an abstract concept in this sense. Amorphous means you can't own it. The concern with Alice and Bilski and the others is you don't want to give one party ownership of something that's important that others need to use to be inventive. This claim doesn't give us the power to own the law of demand. It gives us the power to own one way of getting better information to try to figure out how to price. That's all. There are dozens of ways, probably hundreds of ways, that people have tried to figure out to guess what that demand curve is for their product at that point in time. And it's individual. It's individual products at individual points in time. It'll change. Umbrellas change in the winter. Snowshoes don't sell as high in the summer. Thousands of ways that demand curves for individual products vary over time and vary by product. The idea that that concept is one that we could own by this patent, I think, is belied by the patent itself. Besides the use of the online communications, that is the use of computers and networks to engage in the communications between seller and possible buyers to gather information about what at that moment some class of buyers would be willing to pay, what is new about this? Why is it not the case that before there were networks and there were bazaars, sellers didn't test out prices by saying, today I'm going to charge this and I see how many. It turns out that's too high and I'm not selling anything, so tomorrow I charge something lower. Isn't this all about the gathering by communication of information to enter into the abstract thing called a contract? I think the answer to that is no with an explanation for me. There's two pieces to that. The first piece is that, of course, over time people have, in some form, aggregated information about how much they sold and how much pricing there was. The specification talks about that in column one. The specification also says in column two that if you try to automate that, and there's a figure two in the patent that shows how badly that works in the prior order. They're big lags. Big lags. The patent says in column two about line 25 that even if you automate that, so it's not about the computers or any of that. Even if you automate that, it still looks like figure two. What's different here is two respects. One is that you're testing multiple prices of the same good at the same time. Why is it not pretty familiar that a store or a company with two stores or 15 stores tests out different prices at different stores at the same time? There is no evidence in the record that anybody has done that. That's not something about which we could take judicial notice, that that's a familiar practice. No, it's not. That's a 102 or a 103 issue, in my view, because there are some things like hedging or risk management or intermediate settlements. Everyone knows that's something I think you could take judicial notice of, and they did, and found that that was familiar, traditional, and you can't merely get a patent on automating a practice that's been historical. This is something that would involve clear conflation of 102 and 103 with 101, and there's a line, and the line matters. There is no evidence in this record that suggests that the practices that are covered by these claims are historical, and the only evidence that is in the record is squarely inconsistent with that. The most sophisticated e-commerce merchant on the planet is Amazon. It has an entire department of people whose job it is to try to figure out the best price. They try to hire our people into that department. The most sophisticated merchant on the planet found that our techniques increased their profitability by 7%, equating to over hundreds of millions of dollars. That is very good evidence in this record on the 12v6 motion that must be accepted that says, no, this isn't traditional practice, it's being automated. And so if the argument is this is just a traditional practice being automated, there's nothing on this 12v6 record that would support that, and that's a 102-103 issue, not a 101 issue. Second response to that, if I may, is there's a big piece of this that is squarely within the holding of DDR. DDR is a separate rationale that is independent of what we've been talking about, which is Mayo Step 1, Mayo Step 2. In Mayo Step 2, our view is this is controlled by deer. But independently under DDR, in DDR this court has held that where the problem is different, more acute, particularly sensitive in an online environment, an online solution to that which is different because of the differences in the online environment, is itself not now in that category of an ancient old line practice that is merely being automated. It is a new type of practice addressing a newer type of problem. So just thinking about Claim 1, since you don't make any arguments in your brief to distinguish one claim from another, and maybe I'm wrong here, but... We do, in fairness, Your Honor. I talk about how Claim, for example, 3, which is directed to the web, is different in the sense that a person's interaction by clicking on a website is a greater affirmative expression of interest. And part of the point of this patent, and Claim 17 is also independently relevant for different reasons, but part of the point of this patent is that what you get from the testing, the live testing that this provides, is not just how many people bought at a particular price. You know the number of the universe of people who actually were interested in that product and didn't buy. And that negative information is as important or more when you're trying to set the demand curve. Because all you know if 10 people bought it is that 10 people would pay at least that price. If you then increase the price, or decrease the price, and the number of people who bought and didn't bought changes, that gives you materially more information than the historical practices that have been discussed. And that negative information, because you actually know the universe, because you sent them the emails, or you monitor who's clicking on the website. That's something they couldn't do in the ancient bazaar. Well, unless you had somebody, you know, at the gate to the bazaar counting people, which doesn't seem that, wouldn't seem that surprising. Any bazaar that I went through is, you know, a crowd of people. Well, we keep talking about bazaars just because it was mentioned below, but one can imagine that at any number of stores with single entrances. One can imagine someone counting the number of people entering a Walmart, but now you're talking about counting the people who actually went to look at a particular product, looked at the price, were looking for that product, bought and didn't buy. There's certainly no evidence in this record that anybody has ever done that at anything approaching that level of specificity. And there's evidence to conclude that hasn't been done because the most sophisticated e-commerce merchant on the planet wasn't doing it. So let's put aside the whole e-commerce stuff. Do you think that this whole notion of kind of live testing different prices to come up with a more accurate demand curve is patentable? Patentable under 101 or 102, 103? Under 101. Yes. Absolutely. Because it is improving, as Alice said about Deere, it is improving a problem in a technological process. The technological process doesn't have to be rubber, something tangible or physical. There's very real technological process. I know I'm keeping you over your time, sorry. It's your time, not mine. Right. The demand curve is a basic kind of economic concept. As a concept. The actual curve, people guess at. Right. So if you improve upon that economic concept by saying, here's better ways to make it more accurate, you think that's a patentable idea. All we're doing, we're not improving on the concept. We're improving the data that goes into the concept. Just like Deere improved the data that went into the Arrhenius equation. You had better temperature information going into the Arrhenius equation. Here you have better information about consumer demand going into a guess about the demand curve. In that sense, they're the same. And that for you goes to whether this is computer implemented or not, even though it may be impossible to do in the real world without a computer. In that sense, putting aside the DDR issues that I raised, it is irrelevant whether it's done on a computer. Because the concept of it is just like Deere. You certainly couldn't do it without a computer, but the inventiveness of it, the patentability of it, doesn't depend on the computer at all, just as it didn't in Deere. Why don't you give Mr. Garr a chance and we'll restore your rebuttal. Thank you. Thank you, Judge Toronto, and may it please the court. The 713 patent at issue in this case is ineligible for protection under the patent laws because the price optimization concept that it claims is just as abstract as the price protection concept held ineligible in Bilski and the price fulfillment concept held ineligible in Alice. And just like the patents invalidated in those cases, the patent in this case fails to provide the something more, the something new and significantly inventive that transforms an abstract idea that is unpatentable into a patent-eligible concept under Step 2 of the Mayo Alice framework. Alice makes clear beyond doubt that simply taking the abstract concept of offer-based pricing or price optimization and automating it through the use of generic computer function is not sufficient to pass Alice and Mayo's Step 2 framework. I'd like to go back, if I could, and focus the court on the claims actually before this court. And I think Judge Toronto is quite right that they haven't meaningfully differentiated between the claims and so that the representative claim for resolution before this court is Claim 1. And that's set out, reprinted at page 220 of the appendix to the blue brief. And it has five basic steps, and this is it. First, testing prices by making or receiving offers via electronic message or web page. Second, gathering data about buying decisions at different prices. Third, using a computerized system to take the data and automatically determine estimated outcome of selling goods at each various price point. Fourth, selecting an optimal price from that list. And fifth, offering the product for sale via electronic message at that price. That's it. That's the concept that they claim is eligible for protection and exclusivity under the patent laws. So I don't know if this question will be precise enough, but since we're in 101 land, that may not matter. You do or do not contest the proposition that an inventive way of gathering information for the process of price setting would be eligible under 101? I think, Your Honor, if it's just improving the economic pricing, the concept of pricing, our view is that it's not eligible. What Alice looks to, and this is getting back to Deere, is whether there is a technological improvement to a technological process. That's what Alice said, and it's perfectly consistent with what Deere said, which is Deere found patentable a process for curing synthetic rubber, one element of which was the mathematical formula, the theory. And what Deere repeatedly made clear throughout its decision was that the use of that formula to automatically determine the values was part of an entire process that included the use of a thermocouple, the use of a molding process, the use of the process used to actually get to synthetically cured rubber. And that was significant because, just as Rehnquist said in his opinion, industrial practices such as this are the type which historically have been eligible for patent protection. Now flash forward to Alice. What the court said in Alice about the patent in Deere was that it solved, and this is on page 2358 of its decision, it solved a technical problem in conventional industry practice and it involved an improvement in technology or technological field. The patent in this case does not involve a technological process and it certainly doesn't involve a technological improvement. At best, it claims an improvement in pricing, which is a quintessential abstract economic concept which is not patent eligible under Section 1 or any of this court's cases. It's not patent eligible under Alice, it's not patent eligible under Bilski, it's not patent eligible under Ultramarch or Bice. So even if they had figured out a never-before-thought-of way of determining how many people might be willing to buy how much of something at a particular time and then claimed a setting of prices using that way, that would not be within 101. Let me try to answer that this way. There's a lot of talk in the OIP brief about the software that OIP purportedly brought into Amazon to show them. They call it the Optimo Pricing Solution, I think. And the court takes the facts as true at this stage, but that's the story that they present. But I think what's important about that is they didn't try to come in and actually patent the specific Optimo Pricing Solution and explain in the patent the specific thing that they purportedly showed them. Right, but this is, I guess, what I'm trying to separate. I think you have an argument that this is your argument based on your recitation of the five things going on in Claim 1, that there's just nothing inventive here. Right. That's one argument. Another argument is even if that was an inventive way of coming up with information that would lead to a pricing decision, it still wouldn't qualify under 101. Your Honor, I think that is consistent with the Supreme Court's presence. That question leads you is a place closer to fluke in which all you had was the mathematical formula that was purportedly the newest and best way of arriving at that formula, and you didn't have the technological process, the industrial process. But that said, I think that the example that you're hypothesizing is much different than the case before you. I don't think the court has to hold that it would be impossible to find patent protection under 101 for the type of hypothetical, Your Honor, positive. This case doesn't involve that situation because the claims, as you mentioned, don't remotely go beyond breaking down the basic concept of offer price. You understand, then, that by focusing for the moment on the narrower position, that what's at issue here is not inventive, you naturally lead to the other piece of Mr. Power's argument, which is, how are we supposed to know? On this record, really? Oh, well, in that respect, Your Honor, this is no different than Alice, which was at the summary judgment stage, Bisafe, which was at the pleading stage, Ultramercial, which was at the 12B6 stage. Well, the summary judgment stage might be somewhat different because you actually do get to have discovery and put on evidence. There was an evidence in Alice about whether or not the concept of price fulfillment was an abstract concept or a longstanding commercial practice. And I don't think there would be any basis for taking evidence on whether or not the concept of offer-based pricing is a longstanding commercial practice or economic concept. We can go back and talk about it, how it worked in the bazaar, and we can go forward in time and think about something like the pit at the US Stock Exchange. Well, let's assume for a minute I don't know the first thing about bazaars. How am I supposed to know the answer to this question? Well, we've cited economic theory going back to centuries in our brief about the concept of pricing. And again, I don't think this is any different than the issue that was confronted in Bilski, or in Alice, or in these other cases like Ultramercial. And I think it's irrefutable that offer-based pricing is a longstanding economic commercial practice that is a quintessential abstract idea. There's no need to take any evidence on that. I think where my friend is trying to take the court with references to the evidence and the factual story here is back to their allegations about the specific software that OIP purportedly brought in to show to Amazon. And again, if you look at the claims, it's the claims that matter. This court made that clear in the Accenture case. It's the claims, not allegations or things in the specifications. It's the claims that matter. So all those factual allegations about that are not relevant to the court's interpretations of whether these claims are sufficiently concrete and offensive. How do you respond to this argument about DDR and how it deviates from Alice? Well, Your Honor, there was a good dissent in that case. But I think DDR is distinguishable in two fundamental respects. First, as the majority in that opinion said, the patent in that case didn't simply try to claim an economic concept. And second, and relatedly, the patent in that case was directed to an Internet-centric problem, a problem that arose with the Internet and that the patent tried to solve with respect to transactions over the Internet. Making a click from one website to a next website feel as though you're not moving from one website to another. The look and the feel of the websites would be the same. So in that case, the majority emphasized that the patent was solving an Internet-centric problem. It wasn't simply using the Internet or computers to purportedly solve a long-standing economic problem. In this case, it's exactly the opposite. They're not trying to solve an Internet-centric problem. What the claim is in the patent, and the specification makes this clear about the problem that they're purportedly trying to solve, is they're trying to take the long-standing concept of price optimization and use a computerized system to improve that by optimizing the price. And that's clear from the claim. Can I ask you, is the problem with this that it's a long-standing economic practice that they're trying to do on a computer or that it's an abstract idea that could never have been done? If we went back, you know, thousands of years to the first person that came up with the notion of price optimization, could they have patented that? I think it's both, Your Honor. No, I don't think they could have patented it in the same sense that they couldn't have patented it that they couldn't have patented the law of gravity when it was discovered. I don't think it was patentable, but I think the court's cases in confirming that an abstract instinct, that an abstract idea is present, talk about long-standing economic and commercial practices, and here you certainly have that. Doesn't that get us pretty close to essentially declaring that any kind of business method that improves, that uses these kind of economic ideas, even if it's improving them, is unpatentable? I don't think so, Your Honor. For one thing, these arguments about you can't accept this position because it would mean that business method patents are not patentable, these arguments were made in Alice, they were made in Bilski, they were made in Ultramersh, and the courts have rejected them. Secondly, we do have cases like DDR that recognize that there are concepts involving the Internet, involving the e-commerce environment, that the court held are patentable. The fundamental problem with this case is it doesn't remotely approach DDR area, instead it lies classically within the Alice, Bilski, Ultramersh, or BuySafe area, where you're simply taking a long-standing economic concept, and the supposed improvement is the use of generic computer functions to automate the ability to calculate an optimal price. And under the Supreme Court precedence, under this court's precedence, it's clear that that's not patent eligible. And I think going back in the history of this case, it's noteworthy that when the district court reached its decision, what it had before it was the initial panel decision in the Alice case with the CLS Bank case, as it was known at that time. And in the initial panel, of course, it held that the patent in that case was eligible for protection under 101, and my friends argued that the patent in this case was indistinguishable from the patent in Alice. And we explained to the district court, and the district court agreed, that no, in fact, the patent in this case is even more abstract than the patent in the Alice case, because the patent in this case doesn't even have anything approaching something like the shadow records that they had relied upon in the initial panel decision to find that that price fulfillment concept was patent eligible under Section 101. And so I think as the district court recognized, this case is more extreme than Alice, and the patent in this case has nothing approaching the shadow records in Alice. The district court was right to recognize that this case was further afield from Alice. What we asked this court to do is to apply the Supreme Court precedent, and Alice and Bilski looked to the court's own precedent in cases like BiSafe and Ultramershal and hold that the basic economic concept underlying the 713 patent offer-based pricing is not eligible for protection under the patent laws, that the patent before you in this case, terms of Claim 1, provides nothing close to the significantly more required by Alice and Mayo to transform a basic economic concept available to all into a patent-eligible concept under our patent laws. Are there no further questions? Thank you, Mr. Gardner. Your Honors, I think there are three categories of cases that we're talking about. One is where someone is trying to patent something that is indisputably old. That's Bilski, that's Alice, that's BiSafe, that's content extraction. That's a set of cases where there wasn't a dispute that what was being called the abstract idea was old. And the attempt was to patent that in an online environment where all that was being, the only thing that had changed was the fact that it was being done by computers or online. That's not patentable, that's not this case. There's a second category of cases where what you're trying...  Yes. Were shadow accounts old in Alice or merely the process of some higher level of generality that was talked about? It was treated in Alice as a surrogate for what was old. I don't know that there was any evidence in the record and can't represent that there was or not about whether they were old or new. I think it was treated as a conceptual embodiment of the basic concept. That was how I read the opinion. There's a second category, which is like Mayo, where what you're trying to patent is the law of nature. You've figured out the relationship between this gene or this set of metabolites or something else and nothing else is inventive. Those are not patentable. The third category is defined by Deere. Undeniably had the Arrhenius equation, which is undeniably old. They even had the Arrhenius equation in the claims, which we don't. And the Arrhenius equation is an equation which the law of demand, which I put in quotes, isn't and couldn't be. It's not something you could own the way you could own the Arrhenius equation if it were in a patent. But there, what was patentable was getting new sources of information, a better way to get information, to use that Arrhenius equation. Same equation, same process. Everything else is the same. Nothing unconventional about that for computers. All that was new is they figured out a better way to get information relevant to using that equation. That is this case. We are claiming that we have found a better way to get information to estimate the demand curve. That's patentable in exactly the same way it was in Deere. It is not in the category of Bilski or Alice or BiSafe or content extraction, where there, there was no dispute that what was being claimed as being inventive was old. Here, there is a dispute. And on a 12B6 motion, you can't take judicial notice here that somebody in an ancient bazaar did this or somebody at Walmart did this. There is no evidence of that. And the evidence which must be taken as true here is squarely, irreconcilably inconsistent with that. On this record, on these issues, I would assert that you cannot find this patent to be ineligible under 101. The second point I wanted to make is about the distinction being made about Deere, that it has to be a technological process and that means something tangible like rubber. That is the argument that's being made. That argument, taken to its extreme, and it's already at the extreme, would essentially read out business method patents. I can't think of one that would be valid under Amazon's theory of this case. That argument was squarely precluded by Bilski. It was presented to Bilski and rejected by Bilski. So there is squarely room to say that when Alice says that Deere solved a technological problem in a conventional industry practice, which is the term, there's no dispute that when Amazon and other merchants price, that's a conventional industry practice. And there's no dispute it's a technological problem. How do you get that information? We solve that technological problem or at least have a better solution to it. That's exactly what Alice says Deere does. It's exactly what other cases say Deere is about. Now Amazon's brief tries to make Deere something like an 80s fad that should be ignored the way Milli Vanilli and Cagney and Lacey should be ignored. It's not. It's been given clear modern relevance by Alice. Alice has categorized it as a very specific exception to all of the other cases. Are we solving a technological problem in a conventional industry practice? Absolutely. We prove that by increasing Amazon's net by 7%. Counsel says well that's technology not the claims. In this case one must take as true what was pled. And what was pled is the technology that was tried at Amazon practices these claims. That's not at all the same thing is it? It's not but it's relevant to it. It is relevant but the claims could be sufficiently broad that they encompassed some very, very, very special individual applications that were very, very, very valuable. One could hypothesize a set of circumstances where the Venn diagrams intersected at such a meaningless point. It doesn't have to be meaningless. It's just that broad claims encompass embodiments and some of the embodiments may have details that Amazon was willing to pay a lot of money for or found very valuable anyway but not the broader set which is what your claims cover. True. There is no evidence on that issue either way. The only evidence we have is that the technology that was shown to Amazon increased their net in a very meaningful way and that that practices these claims. Now if one wants to argue that that shouldn't be given effect one would want to have facts that would go down the lines that your Honor was just describing which don't exist on this record. But Mr. Garr makes the point which seems to me to have some weight that essentially the same thing could have been said in at least Alice, maybe in Bilski that who knows how these kinds of, what the past world is with respect to these economic practices without an evidentiary record. Well, and that I think my response to your Honor's question about judicial notice is the answer. I think hedging we all know has been done. Shadow records? Shadow records wasn't viewed by the court at least as anything that is independent of that historical practice. It was representative of general historical practice. So I don't think, I realize my time is up. The only three points I want to leave you with are I think to hold it for Amazon would violate Bilski's admonition that you're essentially reading business method patents out. Second, the DDR exception clearly applies. This is a very different problem than the other. You're wrapping it up. Column four tells you that. And finally, Deere controls and Deere has to be given the effect that Alice says and Deere controls. Thank you, Mr. Powers. Thank you.